FILED

2009 Nov-30  PM 04:02
U.S. DISTRICT COURT
N.D. OF ALABAMA

## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**BYRON I. WILSON,**

     **Plaintiff,**

**v.**                                                      **CIVIL ACTION NO.**
                                                           **2:09-CV-00364-IPJ**

**BELLSOUTH**
**TELECOMMUNICATIONS, INC.,**

     **Defendant.**

## MEMORANDUM OPINION

Pending before the court are defendant's motion for summary judgment (doc. 16), brief (doc. 17), and evidentiary materials (doc. 18) in support of said motion, to which plaintiff filed a response (doc. 26) and evidentiary materials (doc. 25). Defendant filed a reply brief (doc. 28). The court having considered the pleadings, evidence, and briefs of the parties finds as follows:

## I. Factual Background

Plaintiff Byron Wilson brings suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Civil Rights Act of 1991, 42 U.S.C. § 1981a; and 42 U.S.C. § 1981 for discrimination on the basis of race, and for retaliation.

Plaintiff began working for defendant BellSouth Telecommunications, Inc.

("Bellsouth" or "defendant") on May 3, 1999, as an electronic technician.[1]

Plaintiff's employment history with BellSouth includes multiple instances of

discipline from several supervisors.  From October 2002 to October 2005, Kay

Gough served as plaintiff's secondary supervisor and disciplined plaintiff on many

occasions.  Gough Decl., ¶ 5.  On April 9, 2003, a typed note was placed in

plaintiff's file when his failure to act contributed to a missed order.  As a result,

plaintiff received informal counseling[2] concerning the event.  Gough Decl., ¶ 10-

---

[1]Plaintiff's job responsibilities as an electronic technician are highly technical and listed in two documents attached to the Hawley Decl., Ex. A.  Some of the duties include:

> 1.  Works alone and with other employees in testing, adjusting and/or repairing central office equipment and facilities. . . .
> . . .
> 3.  Analyzes defects, tests, repairs and maintains telephone switching circuits and equipment in Company central offices, remote repeated locations, and administrative buildings by using various test equipment.  Makes necessary repairs to equipment and facilities indicated by trouble reports, routine tests and alarms.
> . . .
> 20.  Be certain that your Daily Tally Sheet is correct and reflects *all* work performed each day.  All work activities must be tallied accurately and timely (in real time as the work is being performed/completed). . . .

Ex. A to Hawley Decl. (emphasis in original)

[2]BellSouth has a Discipline Policy for Represented Employees.  The policy outlines a four-step disciplinary process, whereby an employee may be counseled, warned, suspended, and discharged.  The policy states, "The four progressive discipline steps do not have to be followed rigidly in all cases."  *See* Ex. B to O'Bryant Decl.

11.  On April 14, 2003, Bruce Hawthorne, an African-American first-level supervisor of plaintiff's, found that plaintiff failed to follow work instructions on two orders, Gough Decl., ¶ 13, and on April 21, 2003, Hawthorne determined plaintiff failed to follow work instructions on another order.  Gough Decl., ¶ 16. On May 9 and 12, 2003, plaintiff failed to follow work instructions while handling various orders.  Gough Decl., ¶¶ 18-19 & Wilson Decl., ¶ 8.  Supervisory notes, which show that plaintiff was asked why he was not conforming to work instructions, were placed in plaintiff's file on both May 9 and May 12.  Gough Decl., ¶ 19.

Except for a brief period around June 2005, Robby Farley was plaintiff's first-level supervisor from March 2005 to February 2008.  Farley Decl., ¶ 6. Plaintiff was placed on a Performance Improvement Plan on December 7, 2005, because he had unsatisfactory efficiency ratings for September, October, and November of 2005; he successfully completed the plan.  Farley Decl., ¶¶ 9-10 & Wilson Decl., ¶ 3.  An Individual Development Plan dated December 15, 2005, noted that plaintiff had "no desire for personal development at this time."  Farley Dec., ¶ 11.

On March 16, 2006, plaintiff received a warning[3] for failing to follow established procedures when he did not close one of his orders, contributing to the customer's order being cancelled.  Farley Decl., ¶ 12.  On May 2, 2006, Farley informally counseled plaintiff "regarding his continued failure to follow procedures" and because other employees complained to Farley that plaintiff's missteps required them to recheck plaintiff's work before they could continue with their own.  Farley Decl., ¶ 14.  Although plaintiff states that he did not fail to follow work instructions, he stated that work instructions were difficult for him to follow because of the volume of work he had.  Wilson Decl., ¶ 15.  Weeks later, on May 24, 2006, Farley discussed with plaintiff the importance of following work instructions.  Farley Decl., ¶ 15.

In June 2006 plaintiff received informal counseling for failure to follow work instructions, and in July, Farley's supervisor recommended that plaintiff receive formal counseling for failing to follow work instructions; formal counseling was carried out on July 12, 2007.  Farley Decl., ¶ 19 & Wilson Decl., ¶ 17; Farley Decl., ¶¶ 21-22.  On August 15, 2006, Farley was informed that plaintiff placed a command in the computer system that caused a customer to lose

---

[3]After an investigation by plaintiff's union, the warning was removed from his file.  Wilson Decl, ¶ 14.

service for a short period of time; plaintiff later corrected the problem.  Farley
Decl., ¶ 17 & Wilson Decl., ¶ 16.

Another informal counseling note was placed in plaintiff's file on January 9,
2008, for failing to follow work instructions, though plaintiff claims he was held
responsible for another coworker's mistake.  Farley Decl., ¶ 23 & Wilson Decl., ¶
19.  Between January 16 and January 24, 2008, Todd O'Bryant sent an email to
plaintiff explaining that he had to follow work instructions; O'Bryant sent an
email to Farley regarding an order plaintiff mishandled; and Donald Rutledge, one
of Farley's peers, sent Farley an email regarding an order the plaintiff mishandled.
As a result, the plaintiff received formal counseling for failing to follow
established procedures.  Farley Decl., ¶¶ 24-27.  Plaintiff insists that these mishaps
were not his fault, as the computer system for tallying his completed work was not
working and he did in fact follow work instructions.  Wilson Decl., ¶¶ 20-23.

Renee Hawley became plaintiff's supervisor after Farley, from sometime
between January 24, 2008, and March 2008 until plaintiff's termination on August
22, 2008.  Hawley Decl., ¶ 10 & Farley Decl., ¶ 27-28.  On February 28, 2008,
Hawley gave plaintiff a warning[4] for failing to follow established procedures

---

[4]By the time plaintiff came under the supervision of Hawley, he already had
received formal counseling from Farley.

5

because she found he had trouble with orders for three customers, costing each customer two days of service.[5]  Hawley Decl., ¶¶ 28-33.  Less than three months later, plaintiff was informally counseled for ten orders he mishandled on May 19, 2008; Hawley claims plaintiff failed to follow work instructions while plaintiff claims the errors were due to inadequate training.  Hawley Decl., ¶¶ 42-44 & Wilson Decl., ¶ 44.  Plaintiff worked overtime on May 20, 2008, which Hawley explains was unauthorized because all overtime must be pre-approved with the employee's supervisor, Hawley Decl., ¶ 51; plaintiff, on the other hand, claims he was authorized to work by an unidentified AT&T manager.  Wilson Decl., ¶ 47.

Over the period from May 19 to May 22, 2008, plaintiff failed to properly handle and pre-test a circuit, causing the customer an unnecessary delay in service.  Hawley Decl., ¶¶ 55-60.  Plaintiff claimed he needed more training to pretest the circuit.  Wilson Decl., ¶ 48.  As a result, O'Bryant suggested that Hawley sit with and give one-on-one training to plaintiff for a period of five weeks, from May 27, 2008 to July 14, 2008.  Hawley Decl., ¶ 62-63.  The training did not go well.  Plaintiff felt Hawley could not properly train him because she did not know how

---

[5]After receiving the warning, plaintiff filed a grievance with BellSouth and his union.  After grievance proceedings, they reached a settlement whereby Bellsouth agreed to remove the warning from his file if there were no other issues of misconduct for 90 days.  Hawley Decl., ¶ 36 & Wilson Decl., ¶ 41.

to do all the work herself; rather, he claims they learned things together as they went.  Wilson Decl., ¶¶ 49, 51.  Hawley documented the training sessions with detail, *see* Ex. C to Hawley Decl., and plaintiff denies that many of the mistakes Hawley documented ever occurred.  Hawley Decl., ¶¶ 67-71 & Wilson Decl., ¶¶ 52-55.  They had heated disputes about procedure, Hawley Decl., ¶ 71, and plaintiff felt like he was being harassed because he was the only one receiving one-on-one attention.[6]  Wilson Decl., 56; Hawley Decl., ¶¶ 74-75.  Hawley explained that no one else needed training.  Hawley Decl., ¶ 76.  Although plaintiff says half of the information Hawley gave him was incorrect and caused Hawley to question his work when he applied her training, Wilson Decl., ¶ 56, he also testified that they learned a lot together.  Wilson Decl., 57 & Hawley Decl., 80.

On June 5, 6, and 9, 2008, Hawley gave plaintiff tasks to perform after she left work around 4:30 PM.  On June 10, 2008, she ran an activity report that reflected plaintiff  did not perform any work after Hawley left the office at 4:30 PM.  As a result, Hawley suspended plaintiff for three days for failing to follow procedures.  Hawley Decl., ¶¶ 83-85.  Plaintiff testified that he completed the work

---

[6]Plaintiff requested additional training, noted that he needed additional training, or claimed that he had not be trained on various aspects of his job on at least eight occasions.  *See* Wilson Dec., ¶¶ 39, 43, 44, 48, 51, 60, 63, 74.

before Hawley left work that day, and between 4:30 and 5:30 he read training

materials.  Wilson Decl., ¶ 59. On June 12, plaintiff filed an EEOC complaint

because he thought he was being discriminated against on the basis of race.

O'Bryant Dep., at 67; Ex. 10 to O'Bryant Dep.  On June 26, 2008, Hawley ended

the training because it "no longer seemed beneficial and [she] was not going to

continue to argue with [plaintiff]."  Hawley Decl., ¶ 88.  Plaintiff was given no

new orders until July 1, 2008, and his work load was reduced to half until July 29,

2008.  Hawley Decl., ¶¶ 89, 99.

On July 9, 2008, plaintiff again worked unauthorized overtime, despite

being told that morning that overtime was not available.  Hawley, Decl., ¶ 91; Ex.

C to Hawley Decl., at BST 1052.  Plaintiff claims that an unidentified AT&T

manager authorized the overtime.  Wilson Decl., at ¶ 64.   On July 22 plaintiff

could do no work for one and one-half hours because he let his password expire

and could not log in; plaintiff claims he did not intentionally allow his password to

expire on purpose.  Hawley Decl., ¶ 92 & Wilson Decl., ¶ 65.  On July 24 Hawley

found that plaintiff had improperly tallied his work and had taken credit for certain

items he did not perform; of 123 tallies, only 41 were at least partially correct.

Hawley Decl., ¶ 94.  Plaintiff stated he did not tally incorrectly on purpose.

Wilson Decl., ¶ 66.  On July 29 plaintiff closed an order in a manner inconsistent

with work instructions but quickly fixed the problem.  Hawley Decl., ¶ 101 &

Wilson Decl., ¶ 69.  On July 31 plaintiff could not properly test a circuit because

"the testing system was down," so he gave the order to an evening technician

rather than to the BNICS group, the group that could have resolved the problem.

This resulted in a missed deadline.  Hawley Decl., ¶¶ 102-103 & Wilson Decl., ¶

70.  By August 4, 2008, the order had been referred back to plaintiff, but he had

done no work on it because of his "due date orders and pool calls."  Hawley Decl.,

¶ 105 & Wilson Decl., ¶ 71.  When he did work on it, he keyed a code indicating

that the customer was not ready for service and thus caused the missed deadline.

Hawley Decl., ¶ 106 & Wilson Decl., ¶ 72.

　　　With respect to an order that was to be completed by August 7, 2008,

plaintiff worked on the order that day and did not finish it; he informed Hawley

that he was having trouble with it.  Although Hawley said she would try to get him

some help, he did not receive it.  That night, he handed the order to an evening

technician who also worked on it but did not finish.  Plaintiff received the order on

August 8 and 15, and worked on it both days.  When the order was referred to him

again on August 18, he referred the order to a co-worker.  Hawley Decl., ¶  107-

115 & Wilson Decl., ¶ 73.  On August 20 plaintiff "should have turned up [three]

orders to the customer," but apparently failed to do so.  His efficiency rating for

that day was 69.5%,[7] indicating he had plenty of time to turn up the orders.

Hawley Decl., ¶¶ 118-119.

On August 21, 2008, Hawley emailed O'Bryant concerning the quality of work Wilson was doing, his refusal to follow work instructions, his low efficiency rating, his apathy, and his blatant failure to perform certain work activities. Hawley Decl., ¶ 122; Ex. L to Hawley Decl.  On August 22, 2008, O'Bryant made the decision to terminate plaintiff for failing to follow work instructions, repeatedly missing commitments to customers, inconveniencing customers, having a defiant attitude, losing revenue for BellSouth, and causing harm to BellSouth's reputation.   O'Bryant Decl., ¶ 39, 42; Hawley Decl., ¶ 123; Ex. M to Hawley Decl.  By the time he was terminated, Hawley and O'Bryant had discussed the problems Hawley had with plaintiff on several occasions.  O'Bryant Decl., ¶ 43. Both Hawley and O'Bryant thought plaintiff had the skill and training necessary to perform his job, but he chose not to follow work instructions.  Hawley Decl., ¶ 125 & O'Bryant Decl., ¶ 56.

<u>Defendant's Record of Disciplining Other Employees</u>

Plaintiff alleges that Mark Pitts and Buddy Faulkner, both Caucasian

---

[7]Plaintiff claims that when he tallied his work according to his supervisor's instructions, "it made my efficiency look low."  Wilson Decl., ¶ 75.

electronic technicians[8] supervised by Hawley, failed to follow work instructions but were not subject to the same discipline as he was.  Pitts became employed by BellSouth on May 15, 2000 and joined the retail provisioning group at the same time as the plaintiff.  Hawley Dep., at 24.  On May 6, 2008, Pitts received informal counseling for six violations of work procedures on one order and four violations on another.  Hawley Dep., at 26-33.  Later in May, Pitts again failed to follow work instructions and received formal counseling on June 3, 2008.  Hawley Dep., at 33.  On July 1, 2008, after a request from a union steward, Hawley agreed to remove the formal counseling from Pitts' file in 90 days if there were no other occurrences of misconduct.  However, because Pitts was written up for failing to follow work instructions on July 31, 2008, the formal counseling was never removed.  Hawley Dep., at 33-34.  Pitts received a written warning on August 6, 2008, for failing to follow-up with a customer, a violation of work instructions. The warning was removed by Todd O'Bryant in September due to a "miscommunication between centers."  Hawley Dep., at 35-37 & Ex. 6.  On October 14, 2008, Pitts received informal counseling for failure to follow work instructions on four orders.  Hawley Dep., at 37-41.  Finally, on December 19,

---

[8]Mario Baker, an African-American employee supervised by Hawley since November 2006, has not received any formal discipline and follows procedures and instructions.  Hawley Decl., ¶¶ 163-164.

2008, Hawley e-mailed Pitts after he failed to properly handle five orders, thereby violating work instructions.  Hawley Dec., at 41-43.  According to Hawley, Pitts missed critical deadlines, which are internal deadlines that do not affect the customers directly, and his infractions were less frequent than the plaintiff's. Hawley Decl., at ¶¶ 141, 161.

Faulkner also joined the retail provision group at the same time as the plaintiff.  Hawley Dep., at 44.  On May 7, 2008, Faulkner violated work instructions by not doing any work on at least ten orders.  On May 8, 2008, Hawley had an informal discussion with Faulkner regarding the orders.  Hawley Dep., at 45-47.  On May 28 Hawley found that Faulkner had several past due orders again; Faulkner received no discipline for this.  Hawley Dep., at 49-50.  On October 14, 2008, Faulkner received formal counseling when he missed a due date[9] on an order.  Hawley Dep., at 50-51.  Plaintiff's counsel refers to a document, Ex. 11 to Hawley Dep., that allegedly reveals that Faulkner was responsible for 37 days of lost service for various customers.  Plaintiff's Brief, at 12 (doc. 26).  However, the only sworn testimony concerning the document clarifies that many of the missed deadlines could have been caused by the

---

[9]Due dates are significant because they are deadlines given to the customer for when they can expect Bellsouth to have completed their work.  Hawley Dec., ¶ 141.

customer.  Hawley Dep., at 52-55.

Although both Pitts and Faulkner failed to follow work instructions on various occasions, Hawley explained that plaintiff's problems were more severe; she thought plaintiff had a very bad attitude; and Pitts had fewer problems after he completed training.  Hawley Decl., ¶¶ 143-147.  Pitts also made more of an effort to correct his behavior.  Hawley Decl., at ¶ 162.  From February 2008 to August 2008, Pitts failed to meet zero customer deadlines and ten internal deadlines related to ten different orders.  Hawley Decl., ¶ 144.  Plaintiff, however, missed 9 customer deadlines, which resulted in a loss of 42 days of service to the customers, and missed 20 internal deadlines related to 29 orders.  Hawley Decl., ¶ 145.  As for Faulkner, his actions affected a customer on only one occasion, and he received a counseling entry for it in October 2008.  Hawley Decl., ¶ 160.

## II. Standard of Review

A moving party is entitled to summary judgment if there is no genuine issue of material fact, leaving final judgment to be decided as a matter of law.  *See* FED. R. CIV. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1355-56 (1986).  An issue is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.  It is genuine if the record taken as a whole could lead a rational trier

13

of fact to find for the nonmoving party. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The facts, and any reasonable inference therefrom, are to be viewed in the light most favorable to the non-moving party, with any doubt resolved in the nonmovant's favor. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 1609 (1970). Once met by the moving party, however, the burden shifts to the nonmovant to come forward with evidence to establish each element essential to that party's case sufficient to sustain a jury verdict. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990). In addition, the non-moving party's evidence on rebuttal must be significantly probative and not based on mere assertion or merely be colorable. *See* FED. R. CIV. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2511 (1986). Speculation does not create a genuine issue of fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

The court must consider the evidence in the light most favorable to the plaintiff and may not make credibility determinations nor weigh the parties' evidence. *Frederick v. Spring/United Management Co.* 246 F.3d 1305, 1311 (11th Cir. 2001); *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).

### III.  Analysis

A.  Race Discrimination

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973), the Supreme Court announced the burden-shifting analysis that applies to a Title VII claim based on circumstantial evidence.  The analysis requires that the plaintiff first must establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) similarly situated employees not in the plaintiff's classification were treated more favorably; and (4) he was qualified to do the job. *Knight v. Baptist Hospital of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003).

Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the challenged employment decision.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000).  If the defendant articulates one or

more legitimate, non-discriminatory reasons, the presumption of discrimination created by the plaintiff's prima facie case disappears.  *Id.* at 142-43.  The plaintiff then "has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision," but instead were a pretext for discrimination.  *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

1.  Plaintiff's Prima Facie Case of Race Discrimination

BellSouth acknowledges that the plaintiff, an African-American, belongs to a protected class, was qualified, and was subjected to an adverse employment action when he was suspended and terminated.[10]  The issue is whether any similarly situated employees were treated more favorably than the plaintiff.

---

[10]To the extent plaintiff meant to claim discrimination based on the alleged discriminatory acts described in his deposition testimony, *see* Wilson Dep., at 22, 24-25, 27, 29, the court finds these claims abandoned as plaintiff failed to brief such claims in his response to defendant's motion for summary judgment.  *See e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment).  *See also*, *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned).

Wilson has identified Mark Pitts and Buddy Faulkner as Caucasian electronic technicians who, Wilson asserts, were given more favorable treatment despite having similar records of violating work instructions. Plaintiff's Brief, at 16 (doc. 26).

Having considered the facts in the light most favorable to the plaintiff, the court finds as set out below that neither Pitts nor Faulkner were similarly situated to the plaintiff; thus, the plaintiff fails to establish his *prima facie* case. In evaluating whether employees are similarly situated, the Eleventh Circuit has recognized two standards. While one focuses on whether employees who are disciplined in different manners were engaged in "similar" misconduct, the other focuses on whether the employees were engaged in "nearly identical" misconduct. *See Maynard v. Board of Regents*, 342 F.3d 1281, 1290 (11th Cir. 2003) (citing *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)); *Embry v. Callahan Eye Foundation Hospital*, 147 Fed.Appx. 819, *8 n.11 (11th Cir. 2005) (noting that different panels of the Eleventh Circuit have interpreted "similarly situated" differently). Regardless, where the plaintiff is claiming he was disciplined in a disparate manner, "the most important factors . . . are the nature of the offenses committed and the nature of the punishment imposed." *Silvera v. Orange County School*

*Board*, 244 F.3d 1253, 1259 (11th Cir. 2001), *cert. denied*, 535 U.S. 1013, 122 S.Ct. 1598 (2002) (citing *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 (11th Cir. 1998) *opinion modified by* 151 F.3d 1321 (11th Cir. 1998)).

The disciplinary records of Pitts and Faulkner show considerably fewer instances of misconduct than the plaintiff's, and each employee was disciplined according to BellSouth's four-step policy.  Because plaintiff had persistent violations, he progressed further in the disciplinary process until his termination from BellSouth.  While both Pitts and Faulkner were treated in the same manner, the outcome was different because of plaintiff's more extensive record of work rule violations.  The first instance of discipline of Pitts' was May 6, 2008, and the last was on December 18, 2008.  He received informal counseling on May 6 and formal counseling less than a month later.  His formal counseling would have been removed from his file if he stayed out of trouble for 90 days, which he did not do.  The formal counseling was not removed from his record.  In August he received a written warning, and in December he received more informal counseling.  Finally, the last instance of misconduct on December 18 merited an email from his secondary supervisor.  This is the entirety of his disciplinary record, and Faulkner's is even shorter.

Plaintiff's disciplinary record, on the other hand, is much more extensive.

He received informal counseling in April 2003, and supervisory notes were placed in his file twice in May 2003.  In March 2006 plaintiff received a warning, which was later removed from his file.  In May 2006 plaintiff was informally counseled and also had a discussion with his supervisor about the importance of following work rules.    In June 2006 he received informal counseling, and in July 2006 he received formal counseling.  In January 2008 he received both informal and formal counseling.  The next month, in February, he received a warning, and as the result of a settlement with plaintiff's union, it was agreed that the warning would be removed if there were no other issues of misconduct for 90 days.  In May 2008 plaintiff again received informal counseling, and in June plaintiff was suspended for three days.  Two months later, in August 2008, plaintiff was terminated.  These disciplinary measures were doled out by multiple supervisors, including Kay Gough, Robby Farley, Bruce Hawthorne, Renee Hawley, and Todd O'Bryant.

For plaintiff, Pitts, and Faulkner, these methods of discipline were earned for failing to follow work instructions.  The most common infraction was mishandling an order or multiple orders in some manner.  From February 2008 to August 2008–the time period during which Hawley supervised Pitts, Faulkner, and plaintiff–Pitts missed no customer deadlines and ten critical deadlines related to ten orders.  Plaintiff missed nine customer deadlines resulting in forty-two days of

lost service to customers.  He also missed twenty critical deadlines related to twenty-nine orders.  Significantly, plaintiff also worked unauthorized overtime twice, and Pitts made fewer errors after completing training and made more of an effort to correct his behavior.

Under these circumstances, it cannot be said that the nature of the offenses and punishments are similar enough so as to deem plaintiff and Pitts and/or Faulkner as similarly situated employees for the purposes of a Title VII discrimination claim.  Accordingly, plaintiff fails to establish a prima facie case of discrimination.

## 2.  Legitimate, Non-Discriminatory Reasons

Assuming *arguendo* the plaintiff can show that he was treated in a different manner than similarly situated coworkers, the burden shifts to the defendant to produce legitimate, non-discriminatory reasons support the employment action. *See Reeves*, 530 U.S. at 142.  At this stage, the defendant  need only produce the evidence sufficient for the trier of fact to conclude that petitioner suffered an adverse employment action for a legitimate, non-discriminatory reason.  *Id.*

In this case, BellSouth has produced evidence that plaintiff failed to follow work instructions, resulting in missed deadlines that caused its customers to lose service.  Therefore, the defendant has met its light burden.

3.  Pretext

Once the defendant produces a legitimate, non-discriminatory reason, the

plaintiff must prove that the defendant's proffered reason is pretext for illegal

discrimination. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct.

2742, 2752,(1993).  The defendant may prove pretext "directly by persuading the

court that a discriminatory reason more likely motivated the employer or indirectly

by showing that the employer's proffered explanation is unworthy of credence."

*Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095

(1981) (citing *McConnell Douglas*, 411 U.S. at 804-05).

A plaintiff must do more than assert that the allegations against him were

untrue to prove pretext; he must present evidence that the employer's belief in

those allegations is insincere.  *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466,

1471 (11th Cir. 1991).  Thus, "in cases where the decisionmaker does not witness

the alleged infraction, '[a]n employer who fires an employee under the mistaken

but honest impression that the employee violated a work rule is not liable for

discriminatory conduct.'" *Sweeney v. Alabama Alcoholic Beverage Control Bd.*,

117 F.Supp. 2d 1266, 1272 (M.D. Ala. 2000) (citing *Damon v. Fleming*

*Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1363 (11th Cir. 1999)).  Where an

employer relies on another's report of his employee's misconduct, "the plaintiff

must establish pretext by showing . . . that the employer did not rely on that report or that the employer did rely on the report but knew it was false." *Strickland v. Prime Care of Dothan*, 108 F.Supp.2d 1329, 1333 (M.D. Ala. 2000).

Plaintiff alleges that two adverse employment actions resulted from racial discrimination:  his suspension and his termination.  Plaintiff was suspended by Hawley after Hawley assigned plaintiff work to complete while she was out of the office between 4:30 and 5:30 PM on June 5, 6, and 9, 2008.  Plaintiff testified that he completed all of the work prior to 4:30 PM and then studied training manuals until 5:30.  When Hawley ran a report to see what work he had performed between 4:30 and 5:30, the report showed that no work had been logged during that hour.  As a result, Hawley suspended the plaintiff for three days.

As for plaintiff's termination, the record shows many instances that Hawley believed were violations of work instructions.  From June 26 to July 29, 2008, plaintiff's work load was reduced by half.  During that period, plaintiff committed infractions on July 9, 22, 24, 29, and 31, including working unauthorized overtime; doing no work because he locked himself out of his computer for one and one-half hours; improperly tallying two-thirds of his work activity; closing a work order in a manner inconsistent with work instructions;  and failing to hand off an order to the proper group.  Problems continued in August when he delayed

doing work on an order, and when he finally did do the work, he improperly keyed the order to indicate the delay was the customer's fault; worked on an order on August 7, 8, and 15 before referring it to a co-worker on August 18; and received an efficiency rating of only 69.5% on August 20.  On August 21 Hawley emailed O'Bryant detailing these violations, and on August 22, 2008, O'Bryant terminated plaintiff's employment.  At that point, O'Bryant had discussed Hawley's issues with O'Bryant on many occasions.  Both supervisors thought plaintiff received sufficient training to impart the required skill and knowledge on the plaintiff.[11] They both found that plaintiff simply did not want to follow instructions.

Considering these facts in the light most favorable to the plaintiff, the plaintiff has failed to show that Hawley and O'Bryant's stated reasons for the suspension and termination were pretext for illegal discrimination.  With respect to both the suspension and termination, plaintiff cannot survive summary judgment simply by denying that the violations took place or denying that the violations were intentional.  Hawley relied on a report detailing work that had been logged by plaintiff between 4:30 and 5:30 PM on June 5, 6, and 9, 2008. The

---

[11]Plaintiff received the initial three weeks of training that each electronic technician received, even though it was not a continuous three weeks of training; the one-on-one training provided by Hawley; informal and formal counseling from supervisors; and training by co-worker Victoria Cavanagh.  Hawley Decl., ¶¶ 46-47; Wilson Decl., ¶ 36;  O'Bryant Dep., at 64.

report revealed no work performed.  O'Bryant relied on the email from and

discussions with Hawley. Under these circumstances, the defendant has shown

that its supervisors based their decisions on the facts as known to them and they

sincerely believed plaintiff violated work instructions and procedures.  Even if

they were mistaken about the facts, it is well-settled that an "employer may fire an

employee for a good reason, a bad reason, *a reason based on erroneous facts*, or

for no reason at all, as long as its action is not for a discriminatory reason."  *Nix v.*

*WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1187 (11th Cir. 1984) (*Megill v. Bd.*

*of Regents*, 541 F.2d 1073, 1077 (5th Cir. 1976)) (emphasis added).  Accordingly,

as a matter of law, defendant did not base its decisions to discipline plaintiff on

illegal considerations of race.

B.  Retaliation

Plaintiff claims that after he filed a complaint with the Equal Employment

Opportunity Commission, defendant retaliated against him.  He claims the

defendant scrutinized his work and ultimately terminated him on August 22, 2008.

Complaint, ¶ 11.  To prove a case of retaliation through circumstantial evidence,

the plaintiff must use the burden-shifting analysis provided in *McDonnell*

*Douglas*.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).

The plaintiff must show (1) he engaged in statutorily protected conduct; (2) he

suffered an adverse employment action; and (3) there is some causal connection between the two events.  *Olmstead v. Taco Bell Corp.* 141 F.3d 1457, 1460 (11th Cir. 1998) (citing *Meeks v. Computer Assc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)).  If the plaintiff establishes a prima facie case, the defendant may present legitimate, non-retaliatory reasons for the adverse employment action. *Pennington*, 261 F.3d at 1266 (citations omitted).  "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." *Id.* (citation omitted).

1.  Prima Facie Case

Plaintiff claims he was terminated on August 22, 2008, in retaliation for filing an EEOC charge on June 12, 2008.[12]  The first two elements of plaintiff's prima facie case are not in dispute.  Plaintiff claims that he fulfills the third

---

[12]The plaintiff also argues that Hawley discontinued his training in retaliation of the EEOC charge.  Plaintiff filed his EEOC charge on June 12, 2008, Ex. 10 to O'Bryant Dep., and Hawley and O'Bryant first became aware of the charge on June 27, 2008.  Ex. 4 to Evidentiary Material in Opposition to MSJ (doc. 25), Number 8.  Plaintiff argues that after Hawley discovered the EEOC charge, Hawley discontinued plaintiff's specialized, one-on-one training in retaliation.  However, the court finds that cessation of the plaintiff's one-on-one training does not constitute a "serious and material change in the terms, conditions, or privileges of employment" and is therefore not an actionable adverse employment action.  *See Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).

25

element of his case because the termination occurred so quickly after the filing of

the EEOC charge.[13]  "The burden of causation can be met by showing close

temporal proximity between the statutorily protected activity and the adverse

employment action."  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th

Cir. 2007) (citing *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 798-99

(11th Cir. 2000)).  While the Eleventh Circuit has found that  a gap of three and

one-half months between the protected activity and employment action fails to

show causation, *see Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006), a

period of seven weeks has been sufficiently close to prove causation.  *Farley v.*

*Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999).  However, if

intervening acts of misconduct occur during that time, the causal connection may

be severed.  *See Hankins v. AirTran Airways, Inc.*, 237 Fed.Appx. 513, 520-521

(11th Cir. 2007) (discussing *Whatley v. Metropolitan Atlanta Rapid Transit*

*Authority*, 632 F.2d 1325 (5th Cir. 1980) and *Fleming v. Boeing Co.*, 120 F.3d 242

(11th Cir. 1997)).

Even assuming that the causal connection can be established in this case due

to the close temporal proximity between the filing of the EEOC complaint and

_____

[13]It is noted that Hawley and O'Bryant did not know about the EEOC
complaint until approximately June 27, 2008.  Ex. 4 to Evidentiary Material in
Opposition to MSJ (doc. 25), Number 8; O'Bryant Dep., at 69.

plaintiff's termination, the court has detailed above the defendant's sincere belief that plaintiff failed to follow work rules on numerous occasions between July 9 and August 22, 2008.  Each of these violations occurred in between plaintiff's filing of the EEOC complaint and plaintiff's termination.  Accordingly, the court finds that if the causal connection could be established in the first place, it is severed by these intervening acts of misconduct.  Moreover, for the reasons stated above, the court finds that the defendant was motivated by legitimate, non-discriminatory, and non-pretexual reasons in its decision to terminate.

## IV. Conclusion

Having considered the foregoing, and finding that plaintiff has failed to establish any genuine issue of material fact sufficient to allow this case to proceed to trial on his claims against defendant, and that defendant BellSouth is entitled to judgment as a matter of law, it is **ORDERED** that defendant's motion for summary judgment be **GRANTED**.  Plaintiff's claims shall be **DISMISSED WITH PREJUDICE** by separate order.

DONE and ORDERED this 30th of November 2009.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

27